No. 39,893

In re Estate of Levi Correll, Deceased. (DAISY E. CORRELL, Executrix, *Appellee*, v. CHARLES V. HAMM, Special Administrator of the Estate of Christopher C. Correll, Deceased, *Appellant*.)

(290 P. 2d 1050)

Opinion filed December 10, 1955.

*George W. Wingerson*, of Topeka, argued the cause and was on the briefs for the appellant.

*A. L. Foster*, of Parsons, argued the cause and was on the briefs for the appellee.

The opinion of the court was delivered by

ROBB, J.: This was an appeal from the judgment of the district court holding that an insane son received no share in his father's estate under the terms of a will, approving the account of the executrix, decreeing the shares of the other surviving children of the testator, and referring the case back to the probate court with instructions to proceed in accord with the rulings of the district court.

The record, which included a stipulation of facts, showed that

after his wife's death in 1917, Levi Correll executed his will on October 20, 1922, at the age of seventy-seven years. One of his sons, Christopher, was then about thirty-six years of age and had previously been adjudicated insane and committed to the state hospital on July 11, 1913, when he was about twenty-seven years of age. Levi had looked after Christopher and had paid for his care and needs up to the time of Levi's death in 1933. Christopher was in the Osawatomie state hospital at that time. Levi's will was admitted to probate in Labette county and the part in controversy here was as follows:

"Second

"I give and bequeath to my daughter Daisy E. Correll, now of Parsons, Kansas, the sum of four thousand dollars in appreciation of her unselfish kindness to me and her faithfulness in assisting to make a home for me in the declining years of my life.

"Third

"I give and bequeath the rest and residue of my estate of every kind and description of which I may die possessed, to my son Levi A. Correll, now of Chanute, Kansas; my son Joseph F. Correll, now of Parsons, Kansas; my daughter Daisy E. Correll, now of Parsons, Kansas; my son Mack Correll, now of Augusta, Kansas; my son George W. Correll, now of Parsons, Kansas; and my son Christopher C. Correll, now an inmate of the state hospital at Parsons, Kansas, share and share alike; and to him my said son Christopher C. Correll, on the conditions following: The bequest to my son Christopher C. Correll shall be held in trust by my executrix to be safely invested, and the income or so much thereof as may be necessary, and from the principal should it become necessary, be used for his maintenance and care in the state hospital, if he continues there, or if out of the hospital and not cured; but if my said son Christopher C. Correll be discharged from the state hospital cured, said bequest or so much thereof as may be then left shall be by my executrix turned over to him, without further restrictions, to become and be the property of my said son Christopher C. Correll absolute. If not discharged from the hospital cured, then on the death of my said son Christopher C. Correll, the unused balance of the legacy herein bequeathed to him, shall go to, and become and be the property of my issue, share and share alike; and if any of my said issue be then dead leaving living issue, the portion that would otherwise go to such deceased issue, shall be distributed to the living issue of such deceased parent, share and share alike."

Daisy E. Correll, the daughter, was named executrix. She was appointed by the probate court and qualified. She filed an inventory which showed that 280 acres of land were appraised at $7,360.00 and personal property in the sum of $1,030.39. She later filed an accounting on February 11, 1935. No appeal was taken from any of these proceedings and orders.

We shall refer to the various members of the Correll family by their first names.

Further facts were that Mack died on September 4, 1930, without issue, and Joseph died on June 27, 1932, without issue. On March 24, 1944, Christopher was paroled to the Labette county home at Oswego and on June 2, 1951, the superintendent of the Osawatomie state hospital wrote the following letter, dated June 2, 1951, to the probate court of Labette county:

"I hereby notify you that Christopher C. Correll, a patient from your county, was on the 3rd day of June, 1951, discharged from this institution as restored,"

and as a result, therefore, an entry was entered in lunacy docket No. 3, page 54, of the probate court of Labette county, the essential parts of which read as follows:

"And now on this 5th day of June, 1951 . . . notice having been by the Probate Judge of Said County duly received from the Superintendent of the State Hospital at Osawatomie that the said C. C. Correll had been on the 3rd day of June, 1951, discharged from the said hospital restored to his right mind;

"It is, therefore, by the court considered, ordered and adjudged that the said C. C. Correll be, and he is hereby restored to all rights of citizenship. . . ."

There was only $688.50 paid for Christopher's care from Levi's estate and $200.00 thereof was for funeral expenses. Christopher died on November 4, 1953. The state department of social welfare petitioned the probate court of Labette county for the appointment of an administrator of Christopher's estate and a hearing was had on February 16, 1954. Daisy filed a written defense in the trial and asked to be appointed administratrix as sister of Christopher, but the court on February 16, 1954, appointed H. L. Lane, as acting administrator. On April 27, 1954, Charles V. Hamm was appointed special administrator and has acted in that capacity ever since.

Levi A., brother of Daisy and Christopher, died intestate on July 4, 1943, leaving two sons, Garth and Jesse. On July 22, 1938, he had conveyed his interest to Daisy by warranty deed, which was filed of record on April 19, 1954.

Daisy made no further report or accounting in Levi's estate after the accounting in 1935 until she filed her petition for final settlement on March 9, 1954, wherein she set out the fact of Christopher's death on November 4, 1953; that at no time from the date of his father's death until his own was Christopher capable of managing his affairs or taking care of himself. The devisees and legatees and their interests were as follows:

Levi A. Correll, 1/4

Daisy E. Correll, 1/4 plus 1/12; $4,000 legacy

George W. Correll, 1/4 plus 1/12

Garth A. Correll, son of Levi A., 1/24

Jesse A. Correll, son of Levi A., 1/24.

The petition for final settlement further showed that there had been income of only $957.16 during the twenty years.

To this petition for final settlement, the special administrator of Christopher's estate filed an answer stating that the accounting was incorrect, that Christopher was discharged from Osawatomie state hospital as cured in March, 1944 (this was later stipulated to be June 5, 1951) and that Christopher became the legal and equitable owner of a one fourth interest in his father's real property on June 5, 1951, the date of his discharge as restored; he was entitled thereto along with one fourth of the net profits from the operation of the farm from February 11, 1935.

Daisy, as executrix, filed a reply in the terms of a general denial. On May 11, 1954, she filed a petition as legatee, and also in her capacity as executrix, to have the cause transferred to the district court for the best interests of all persons concerned, thus avoiding the possibility of an appeal and trial *de novo* in the district court after a trial in the probate court. In this petition it was also shown that George W. died on April 13, 1954, and that his widow was Edith. The probate court ordered the cause transferred to the district court for hearing and determination of all issues necessary for a final settlement of this estate.

At the outset in the district court Daisy requested findings of fact and conclusions of law. The information in the stipulation of facts was substantially the same as that included in the requested findings of fact and conclusions of law except for some additions that are not necessary to the determination of this appeal.

Daisy offered her evidence, which included her petition for final settlement. The special administrator of Christopher's estate offered his defense evidence, which included the letter from the superintendent of the Osawatomie state hospital and the entry in the lunacy docket of the probate court of Labette county. Rebuttal testimony was introduced by four laymen. The testimony of the first witness, a railway express agency messenger, showed that Christopher's facial expression was blank, he was noncommittal about his health, and he would just stare instead of conversing. The testimony of the

second witness, who had been a county commissioner of Labette county from 1936 to 1948, was incompetent because it was admitted that Christopher was insane at the times this witness saw him. The third witness, a social worker in the Parsons state training school, who had been county welfare director from February, 1945, to September, 1953, testified that Christopher would either be in a cottage or working in the yard at the county farm or the tri-state restorium when the witness made his visits to those places. On those occasions Christopher was not insane, but he was incompetent. The fourth witness, a fiscal officer and acting director of welfare in Labette county, testified he had been introduced to Christopher while visiting the tri-state restorium; that Christopher was stooped, was sitting on the side of his bed, and that he didn't speak, he just smiled; he was neither sane nor insane.

At the conclusion of this testimony request was again made for findings of fact and conclusions of law, which request was objected to by the special administrator. The court granted the request and gave the parties until November 1, 1954, to file suggested findings of fact and conclusions of law.

The court made twenty-seven findings in accordance with the facts heretofore stated and the stipulation of the parties. It is not necessary that all of the court's findings be set out in full, but in order to give a complete picture of this case, we have condensed the pertinent ones as follows:

Levi Correll, the testator, intended to provide care and maintenance for Christopher so long as Christopher was mentally incapable of managing his own affairs and whether he was in or out of the Osawatomie state hospital.

The testator intended that in the event Christopher became mentally capable of managing his own affairs, he should thereupon share in his father's estate.

The testator intended that if Christopher died, not having attained mental competency and before becoming capable of managing his own affairs, the share which would otherwise have gone to him should go to the issue of the testator, share and share alike.

Christopher was insane and mentally incapable of managing his affairs and taking care of himself at all times from the date of his adjudication as an insane person to his death; that from the date of his father's death to his death, a period of over twenty years, Christopher never claimed any interest in his deceased father's estate and received only his support therefrom.

The superintendent of the state hospital at Osawatomie did not see or examine Christopher from the date of parole until his death and was not in a position to observe the symptoms and conduct of Christopher.

If Christopher was discharged from the state hospital "cured," the will of

Levi bequeathed a share to him and the bequest should go direct to him; but if he were not discharged from the hospital "cured," the property would go to other devisees and legatees.

Levi used the word "cured" in the commonly accepted lay meaning, which was that Christopher should be "cured" of his insanity and his mental condition should undergo a radical change resulting in his sanity; and that within the intent of Levi, this did not provide for any errors on the part of the authorities in charge of the Osawatomie state hospital in discharging Christopher as "cured" when he was insane and wholly incompetent to manage his affairs from adjudication to his death.

The record does not show clear, ample and conclusive proof that the mental condition of Christopher underwent any radical change.

Upon his death Christopher held no title to said real estate or any other property belonging to the estate.

Appellant also makes objections to various other findings of fact, but because of similarity with them and the findings already set out, it is unnecessary for us to include them here.

The substance of the trial court's conclusions of law was that the special administrator took nothing by reason of his answer thereby cutting off any claim of the state department of social welfare; Christopher was insane from the time of adjudication until his death; the state hospital superintendent had no power, nor was he required, to determine the sanity or insanity of Christopher nor did he do so at the time of discharge or thereafter; that due to insanity and mental incompetency from adjudication until death, Christopher did not take any legacy in the real property or personal property covered by his father's will; Christopher was never adjudged cured by inquest as provided by statute; Christopher did not own any title to any property of his father's estate and was not entitled to any money other than that which he received for care and maintenance; neither the administrator nor the special administrator had any right, title or interest in the property or to the money in Levi's estate; and finally, the matter was referred back to the probate court with instructions to enter judgment in accordance with the findings and conclusions.

In the journal entry the court repeated the findings and conclusions and found generally in favor of Daisy and against the special administrator and then set out and determined the following legatees and devisees:

Daisy E. Correll, legacy of $4,000 plus $\frac{1}{2}$ of the remainder of the estate;
George W. Correll, $\frac{1}{4}$ interest after deduction of above legacy;
Levi A. Correll, $\frac{1}{4}$ interest after deduction of above legacy;

Garth A. Correll, 1/24 interest after deduction of above legacy;
Jesse A. Correll, 1/24 interest after deduction of above legacy.

A motion for new trial was filed. Some objections were raised in the trial court and evidence was introduced and a final conclusion was reached by the parties and the trial court that the motion was filed in time. The motion was then considered and overruled. This appeal followed. The matter of the lateness of filing the motion for new trial appeared in the record here, but appellee did not press the matter. We might mention, also, that although the record indicated there was an objection by appellee as to the sufficiency of the abstract, that matter was later admitted to be nonprejudicial and inconsequential by appellee.

The specifications of error were that the trial court erred (1) in overruling appellant's motion for new trial; in admitting and considering improper evidence regarding the mental condition of Christopher C. Correll after June 5, 1951; in failing to give weight and effect to G. S. 1949, 59-2007 and 59-2276; in holding in effect that the will of Levi Correll was ambiguous and needed construction; in holding the trial court had jurisdiction to find Christopher C. Correll incompetent and that all the issues in this matter had been heard; in ordering the payment of a $4,000 legacy to the executrix of the estate of Levi Correll, deceased; and (2) that findings of fact No. 9, 10, 11, 15, 16, 18, 19, 20, 21, 22, 23, 24, 25, 26, and 27 made by the trial court were contrary to the evidence and the law; and conclusions of law No. 1, 2, 3, 4, 5, 6, 7, and 8 were contrary to law.

In this case we must bear in mind that this is an appeal in the matter of the estate of Levi Correll, deceased, and not an appeal from the order of the probate court of Labette county, which was entered in that court's lunacy docket No. 3, page 54, and was set out in the record and stipulated as a fact by the parties. Whatever effect that order had is binding in this appeal. Neither can we litigate claims of the state department of social welfare against the estate of Christopher C. Correll, deceased. The only parties actually involved in this case are Daisy, as executrix of the estate of Levi Correll, deceased, who is seeking to have her petition for final settlement approved in order that Levi's estate may be closed, and the special administrator of Christopher C. Correll, who has filed objections to the final settlement and is claiming an interest in the estate of and under the terms of the will of Levi Correll.

The only manner in which Christopher could receive his share of Levi's estate was to qualify under the provisions of the will as follows:

". . . but if my said son Christopher C. Correll be discharged from the state hospital *cured,* said bequest or so much thereof as may be then left shall be by my executrix turned over to him, without further restrictions, to become and be the property of my said son Christopher C. Correll absolute." (Our emphasis.)

It is conceded by the parties that if Christopher was discharged as "cured," he would thereby qualify and take his share. However, although the letter of the superintendent of the Osawatomie state hospital stated that Christopher was "restored" and the probate court's lunacy record, after reciting the contents of the notice from the superintendent, stated that Christopher "be and is hereby restored to all rights of citizenship," appellee contended these were not sufficient to show that Christopher was "cured."

Both appellee and the trial court considered matters which were not pertinent to the question involved in this case. This was not a proceedings whereby a person who had been previously adjudged insane was attempting by his own efforts, or through someone else in his behalf, to be declared restored to capacity as is contemplated by G. S. 1949, 59-2268, which reads in part as follows:

"Any person who has been adjudged insane . . . may petition the court in which he was so adjudicated . . . to be restored to capacity . . . Any person may oppose such restoration. Upon hearing of the petition and proof that such person has been restored to capacity and is capable of managing his person and estate, the court shall adjudge him restored to capacity . . ."

See, also, 3 Bartlett's Kansas Probate Law and Practice, rev. ed., § 1410.

In *Holder v. Jochems,* 167 Kan. 83, 204 P. 2d 777, there was involved a different set of facts, but it was the type of case intended to be covered by G. S. 1949, 59-2268. The petition in which restoration of capacity was requested had been filed by the party who had been adjudged mentally incompetent. It was there stated that in construing a statute where the language is plain, it is not the function of this court to search for reasons for its legislative enactment. (See, also, *In re Estate of Holder,* 168 Kan. 657, 662, 215 P. 2d 166.)

The state by and through the probate court provides the only manner or method whereby a person can be found insane and

committed to one of the state institutions maintained for the care and treatment of such persons (3 Bartlett's Kansas Probate Law and Practice, rev. ed., § 1422) and the legislature likewise provided a statutory procedure which is the only avenue open to the insane person, either through his own efforts or efforts of another in his behalf, to be restored to capacity and to his proper place in the society of his fellow citizens.

Following this line of discussion, we find there is another method provided whereby an insane person, who has been adjudicated and committed and has no means of making the necessary application on his own behalf and there is no other person to make the application for him, may be restored to capacity. G. S. 1949, 59-2007 reads in part as follows:

"Authority to discharge patients from state hospitals for the insane is vested in the state department of social welfare, but may be delegated to the superintendent . . . Discharges may be made for any of the following reasons: (1) The patient is not insane. (2) He has been restored to capacity . . . Authority is also vested . . . to release patients on parole. . . ."

The above statute makes it possible for the state, which determined that the patient should be committed in the first place, to determine whether he is entitled to be discharged as restored to capacity. We are not confronted here with a patient who had been released on parole or discharged as improved, but with one who had been discharged as restored to capacity, with full rights of citizenship.

Had the legislature stopped with G. S. 1949, 59-2007, then appellee's theory, which was followed by the trial court, would be reasonable in that an insane person, or someone in his behalf, would have to comply with G. S. 1949, 59-2268 above quoted, but G. S. 1949, 59-2276 was also enacted. It provides:

"When notice is received from the superintendent of a state hospital by the court of the patient's residence that a patient has been discharged as restored to capacity, the court *shall* make an order that the patient has been restored to capacity." (Our emphasis.)

From the above it is clear that the probate court shall order a patient restored to capacity when notice is received.

To follow appellee's contention would mean that the last quoted statute would be made valueless because G. S. 1949, 59-2268 states that after hearing and proof "that such person has been restored to capacity . . . the court shall adjudge him restored to capacity,"

and G. S. 1949, 59-2276 states that after "notice . . . the court shall make an order that the patient has been restored to capacity," and would thereby deprive the state, which had committed and detained the patient through a probate court order (G. S. 1949, 59-2003; 59-2005), from discharging that patient as restored to capacity.

The contention is also made that the superintendent had no access to Christopher, but the record does not bear that out, and it is further contended that the state department of social welfare through the superintendent of the state hospital should not be allowed to determine whether a party is capable of taking care of himself and his property. In Kansas our state mental institutions in recent years have made marked progress toward improvement in the care, treatment, and rehabilitation of the mentally ill. These institutions are staffed with competent, professional men and women trained in their respective fields. The legislature saw fit to provide a procedure (G. S. 1949, 59-2007) under which the superintendent of a state hospital has the authority delegated to him by the state department of social welfare to determine whether a patient should be discharged as restored to capacity. Courts are not concerned with the wisdom of legislative policy. (*Clifford v. Eacrett*, 163 Kan. 471, 183 P. 2d 861.)

It is elementary that the law does not require a person to do a useless thing, and the point that Christopher did not need two orders of the probate court to restore him to capacity does not need further discussion.

In our opinion the word "cured" as used by Levi in his will is synonymous with "restored." In *Johnson v. Schoch*, 85 Kan. 837, 118 Pac. 696, regarding the effect of the word "cured," this court said:

"The statute is that only those who have been *cured* and are of sound mind shall be *restored* to the rights of a citizen." (Our emphasis.) (p. 839.)

In this connection see Webster's New International Dictionary, 2d ed., p. 646, where "cure" is defined as ". . . to restore to health, soundness, or sanity," and to p. 2125, where "restore" is defined as "To make calm or tranquil in mind." See, also, 10 Words and Phrases, perm ed., p. 668; 3 Bartlett's Kansas Probate Law and Practice, rev. ed., § 1433.

There are many other interesting subjects and authorities included

in the record in this case, but we do not think it is necessary to explore all of them in view of what has been said.

The trial court erred in concluding that Christopher was not entitled to receive his legacy under his father's will the same as any of the other surviving children. The special administrator of the estate of Christopher had a right to challenge the correctness of the petition for final settlement and to have this issue tried along with any and all other issues raised by the pleadings.

The judgment is reversed and the trial court is directed to enter judgment in conformity with this opinion granting the estate of Christopher C. Correll, deceased, a share in the estate of Levi Correll, the same as that which any other surviving child of Levi will receive under the will of Levi Correll, and to try and determine all other issues raised by the pleadings filed in the matter of the estate of Levi Correll, deceased.